Argued and submitted April 30, 2012, affirmed April 3, petition for review denied July 25, 2013 (353 Or 868)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**JOHNATHAN ERNEST REED,**
*Defendant-Appellant.*

Jackson County Circuit Court
095252FE; A145172

299 P3d 574

Susan F. Drake, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

In this criminal case, defendant appeals from a judgment convicting him of one count of unauthorized use of a vehicle, ORS 164.135, four counts of felony fleeing or attempting to elude a police officer, ORS 811.540, and one count of reckless driving, ORS 811.140. Defendant assigns error to the trial court's entry of separate convictions on the four counts of attempting to elude a police officer, arguing, as he did before the trial court, that those counts should have merged because the antimerger statute, ORS 161.067, does not apply. We conclude that ORS 161.067(3) does apply because defendant committed multiple violations of ORS 811.540 and the violations were separated by sufficient pauses.[1] Accordingly, we affirm.

After leading police officers on a series of chases, defendant was charged with, *inter alia*, four counts of attempting to elude. Each count alleged that defendant had attempted to elude a different police officer. The issue on appeal is whether the guilty verdicts on those four counts should merge. As explained below, in order to support multiple convictions for attempting to elude, (1) the defendant must have completed each attempt to elude—that is, he must have stopped running or hiding—before beginning the next attempt to elude, and (2) each attempt to elude must have been separated from the others by a pause in the defendant's criminal conduct sufficient to afford him an opportunity to renounce his criminal intent. ORS 161.067(3); *see* 256 Or App at 67-70.

Whether a defendant stopped running or hiding from the police at a particular point in time is a question of historical fact. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) ("What actually transpired is a question of fact for

---

[1] Defendant also argues that, under both the United States Constitution, *see Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004); *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and the Oregon Constitution, *see State v. Wedge*, 293 Or 598, 608-09, 652 P2d 773 (1982), his rights were violated when the trial court entered four convictions under ORS 161.067(3) in the absence of a determination by the jury that there were sufficient pauses between defendant's attempts to elude the police. Those arguments are not preserved and do not constitute error apparent on the record. ORAP 5.45(4); *State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990). Therefore, we do not address them.

the trial court or jury."). We are bound by the findings of the trier of fact, provided that the findings are supported by constitutionally sufficient evidence. *Id.*; *see State v. Watkins*, 236 Or App 339, 345, 236 P3d 770, *rev den*, 349 Or 480 (2010) (appellate court is "bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support those findings" (internal quotation marks omitted)). If the trier of fact does not make express findings and there is evidence from which the facts could be decided in more than one way, we presume that the facts were decided in a manner consistent with the trier of fact's ultimate conclusion. *Ball*, 250 Or at 487. Thus, in this case, we must determine whether there was constitutionally sufficient evidence to support the trial court's implicit findings that defendant had stopped running and hiding between each of the charged attempts to elude. If there was, then the trial court correctly concluded, as a matter of law, that defendant had completed each of the charged attempts to elude before beginning the next one; that is, he had committed repeated violations of the attempt to elude statute, as opposed to a continuing violation of the statute.

If the trial court correctly concluded that defendant had completed each attempt to elude before beginning the next one, then the question becomes whether the attempts to elude were separated by sufficient pauses. The duration of a pause and what a defendant did during a pause are also questions of historical fact. *See, e.g., State v. Aitken*, 255 Or App 17, 22-23, 296 P3d 587 (2013) (concluding that the timing of the defendant's two stabbings of the victim and the events that occurred between the two incidents were matters of historical fact). Whether the pause was sufficient to afford the defendant an opportunity to renounce his criminal intent is a question of law, which we review for errors of law. ORS 138.220; *State v. McConville*, 243 Or App 275, 277, 283, 259 P3d 947 (2011).

Because we must determine whether there was sufficient evidence to support both (1) the trial court's implicit findings that defendant had stopped running and hiding between each of the charged attempts to elude and (2) its legal conclusion that there was a sufficient pause between each of the attempts to elude to afford him the opportunity

to renounce his criminal intent, we recount the facts in some detail. At the outset, we note that defendant was charged with attempting to elude (1) Officer Rydell, (2) Officer Moffitt, (3) Officer Whiteman, and (4) Officer Hull.

Shortly after 2:00 a.m. on December 28, 2009, Medford police officer Rydell, who was in an unmarked patrol car with another officer, Arnold, observed a black Honda Prelude, driven by defendant, weaving over the center and fog lines on S. Central Avenue in Medford. She followed the vehicle. Defendant pulled into a gas station. Rydell also pulled into the gas station and waited for defendant to leave. When he did, she followed him and, shortly thereafter, at 2:14 a.m., activated the lights on her car. Defendant continued driving, very slowly—10 to 15 miles per hour—and then began to weave dramatically, so that he left one lane entirely before returning to it. Rydell then "chirped" her siren to make sure that defendant was aware of her presence. Defendant sped up to approximately 20 to 25 miles per hour and Rydell turned her siren on all the way. Defendant sped up more and turned right at a red light without stopping. When Rydell turned right as well, defendant had accelerated so fast that she could see only "dirt and debris and dust flying." She thought that she saw defendant turn right at an intersection ahead. At that point, in accordance with Medford Police Department policy, Rydell terminated her pursuit of defendant. She turned off her siren and overhead lights and drove at the speed limit toward the place where she thought he had turned.

Rydell searched the area for defendant for approximately 20 minutes. During that time, she was in radio contact with dispatch and with other officers, some of whom assisted with the search. Rydell located the Prelude on Vancouver Avenue near 9th Street. It was "parked right there, * * * kind of blacked out, no lights on." Rydell shined her spotlight on the windshield, and defendant looked up at her and then backed down Vancouver Avenue away from 9th Street. As Rydell drove toward defendant, he reversed course and drove forward toward her vehicle. Rydell swerved to avoid being hit by defendant, and he drove up Vancouver Avenue and turned east onto 9th Street. Rydell alerted the other officers that defendant was heading east on 9th Street,

turned around, and attempted to follow defendant, but by that time, he was gone.

Another Medford police officer, Moffitt, had heard Rydell's radio communications and was a few blocks away when Rydell found defendant on Vancouver Avenue. When Moffitt heard Rydell say that defendant was heading east on 9th Street, he did a U-turn, which left him facing south on Willamette Avenue. Defendant turned south from 9th Street onto Willamette Avenue "right in front" of Moffitt. Moffitt turned on his overhead lights and siren and followed defendant as he went through a stop sign and several red lights, weaving and driving 40 to 50 miles per hour. Eventually defendant turned onto S. Pacific Highway and, traveling south, accelerated to 70 miles per hour. Moffitt turned off his siren and overhead lights and continued to follow defendant from a distance, going 45 miles per hour. Defendant pulled into a parking lot, did a U-turn, turned back onto S. Pacific Highway, and continued driving south, toward the City of Phoenix, "extremely fast." Moffitt notified dispatch and continued to Phoenix, driving the speed limit. In Phoenix, he learned from bystanders that defendant had driven past them and headed toward Interstate 5. Moffitt then returned to Medford. He did not testify as to what time he lost sight of defendant.

The next officer who chased defendant was Whiteman, another Medford police officer. Whiteman heard Rydell report her initial encounter with defendant and heard that Moffitt was following defendant. After Moffitt lost sight of defendant, Whiteman explained, "we searched the area, we were unable to find the vehicle." Then Whiteman parked in a parking lot in central Medford. Around 3:00 a.m., from his vantage point in the parking lot, he saw defendant, who had apparently returned from Phoenix, driving south on Crater Lake Avenue, approaching Main Street. Whiteman pulled out of the parking lot and followed defendant, who turned west onto Main Street. Eventually other police cars were following Whiteman as he followed defendant. At first, defendant was driving around 25 miles per hour and Whiteman did not attempt to initiate a stop. Then Whiteman turned on his overhead lights, and defendant accelerated to

35 to 40 miles per hour. After that, Whiteman turned on his siren as well.

Whiteman received permission to attempt a pursuit intervention technique (PIT) to stop defendant, but when he pulled alongside defendant his speed was 42 miles per hour, which exceeded the limit for the technique. He backed off, and defendant accelerated to approximately 60 miles per hour and cut through the middle of an "S-curve." Whiteman terminated his pursuit, turning off his overhead lights and siren. Defendant slowed down, and Whiteman followed 200 to 300 yards behind. Eventually he got closer to defendant, again intending to attempt a PIT, but defendant again sped up to 60 miles per hour and Whiteman lost sight of him.

Whiteman searched the area where he had last seen defendant and eventually found him again. Another Medford police officer, Vollrath, then followed defendant and attempted to stop him. After Vollrath had followed defendant for some time, defendant sped up significantly and Vollrath terminated his pursuit. He continued following defendant from a distance as defendant went back into central Medford, but after defendant went through a red light and accelerated very quickly, Vollrath lost sight of him.

A Phoenix police officer, Hull, had heard about defendant on the radio and knew that he had been in Phoenix during the chase. Hull waited in Phoenix at the intersection of S. Stage Road and S. Pacific Highway, and, around 3:36 a.m., defendant stopped at the stoplight at that intersection. Defendant turned north on S. Pacific Highway, and Hull followed. He turned on his overhead lights and siren, and defendant continued driving, going 55 to 60 miles per hour, until he was close to central Medford. Defendant stopped the car and surrendered to Hull and numerous other officers who had come to the scene.

As mentioned, defendant was charged with, *inter alia*, four counts of felony attempt to elude a police officer. ORS 811.540. A jury convicted defendant. At sentencing, defense counsel argued that the four counts should merge because defendant's attempt to elude the police was "an ongoing occurrence over an hour and a half." She pointed out that several of the officers had not testified regarding how

long they had pursued defendant and when they had started and stopped. She also noted that the officers, rather than defendant, had decided when to terminate their pursuit, and that he had always been found or picked up by another officer in a relatively short period of time. The trial court rejected defendant's argument, concluding that defendant had attempted to elude the police four times and that each violation had been separated from the others by a "sufficient pause."[2] ORS 161.067(3). On appeal, defendant renews the argument that he made before the trial court, arguing that "the state failed to introduce evidence of a sufficient break in defendant's conduct to renounce his intent to elude police."

Merger is governed by ORS 161.067, which provides:

"(1)   When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations.

"(2)   When the same conduct or criminal episode, though violating only one statutory provision involves two or more victims, there are as many separately punishable offenses as there are victims. * * *

"* * * * *

"(3)   When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent. * * *"

As noted above, the issues here are (1) whether defendant violated the attempt to elude statute, ORS 811.540, repeatedly and (2), if so, whether each violation was "separated from other such violations by a sufficient pause in the defendant's

---

[2] The trial court held, in the alternative, that ORS 161.067(2) prevented merger because each officer was a separate victim. On appeal, defendant disputes that conclusion, and the state does not defend it. Because we affirm on the trial court's reasoning as to ORS 161.067(3), we do not address that alternative ruling.

criminal conduct to afford the defendant an opportunity to renounce the criminal intent." ORS 161.067(3).

In order for a pause to be *between* violations, "one crime must end before another begins." *State v. Barnum,* 333 Or 297, 303, 39 P3d 178 (2002), *overruled on other grounds by State v. White,* 341 Or 624, 147 P3d 313 (2006); *McConville,* 243 Or App at 281; *Watkins,* 236 Or App at 346. A sufficient pause is "a temporary or brief cessation of a defendant's criminal conduct that occurs between repeated violations and is so marked in scope or quality that it affords a defendant the opportunity to renounce his or her criminal intent." *State v. Huffman,* 234 Or App 177, 184, 227 P3d 1206 (2010).

Determination of whether a defendant's conduct amounts to multiple violations requires consideration of the statute defining the crime. *See, e.g., id.* at 186 (considering first-degree theft statute and case law interpreting it); *State v. Gerlach,* 255 Or App 614, 617-20, 300 P3d 193 (2013) (considering kidnapping statutes and case law interpreting them). ORS 811.540, the attempt to elude statute, provides:

"(1)   A person commits the crime of fleeing or attempting to elude a police officer if:

"(a)   The person is operating a motor vehicle; and

"(b)   A police officer who is in uniform and prominently displaying the police officer's badge of office or operating a vehicle appropriately marked showing it to be an official police vehicle gives a visual or audible signal to bring the vehicle to a stop, including any signal by hand, voice, emergency light or siren, and either:

"(A)   The person, while still in the vehicle, knowingly flees or attempts to elude a pursuing police officer; or

"(B)   The person gets out of the vehicle and knowingly flees or attempts to elude the police officer."

In *State v. Cave,* 223 Or App 60, 68, 195 P3d 446 (2008), *rev den,* 345 Or 690 (2009), we interpreted ORS 811.540's provision regarding attempting to elude on foot to continue, at least "momentarily," after the defendant is out of sight of the pursuing police officer. In *Cave,* several officers

pursued the defendant, who was driving a truck, but he sped away down a gravel road. *Id.* at 63. The officers later found the defendant's truck parked on a spur road off the gravel road. The defendant testified that he had jumped out of the truck and run away, knowing that the police were behind him. *Id.* at 64. The defendant assigned error to the trial court's denial of his motion for judgment of acquittal, arguing that, under ORS 811.540(1)(b)(B), a police officer must be present when the defendant gets out of the vehicle and flees or attempts to elude the officer. *Id.* at 65-66.

We interpreted "flee" to mean "'to run away from : endeavor to avoid * * * or escape from,'" *id.* at 67-68 (omission in *Cave*) (quoting *Webster's Third New Int'l Dictionary* 868 (unabridged ed 2002)), and "elude" to mean "'to escape the notice or perception of,'" *Cave*, 223 Or App at 68 (quoting *Webster's* at 738). Then we explained:

> "[I]t is possible for a person to 'flee[ ] or attempt[ ] to elude the police officer' even after he or she escapes the line of sight of the police officers. The focus of ORS 811.540(1)(b)(B) is on whether the person is 'run[ning] away from' or attempting 'to escape the notice or perception of' the police officers when he or she gets out of the vehicle. If the pursuing police officers momentarily lose sight of the person, that does not mean that, at that moment, the person is no longer fleeing or attempting to elude the officers."

*Id.* (second through fourth brackets in original). Thus, in light of the defendant's admission that he had jumped out of his truck knowing that the officers were still pursuing him, we affirmed the trial court's denial of the motion for judgment of acquittal. *Id.* That is, we concluded that a trier of fact could reasonably find that the defendant was still running or hiding from the police, who had signaled for him to stop, when he jumped out of his truck.

*Cave* teaches that the focus of an attempt to elude is the defendant's conduct, not the conduct of the officers. Accordingly, the mere fact that numerous officers pursue a defendant does not give rise to multiple violations of the statute for the purposes of ORS 161.067(3). In addition, the fact that an officer briefly loses sight of the defendant, or the fact that one officer's pursuit ends and another's begins, alone, cannot establish multiple violations because

nothing suggests that the defendant has ceased to "run[] away from" or attempt "to escape the notice or perception of" the officers. *Cave*, 223 Or App at 68 (brackets in original; internal quotation marks omitted).

Here, however, defendant's attempts to elude were separated by more than just transitions between officers. Although the four attempts to elude occurred in a series, there was evidence from which the trial court could find that, after each of the attempts to elude, defendant stopped running and hiding and had sufficient time to make a new, independent decision whether to elude the next pursuer. Specifically, there was evidence with respect to each attempt to elude that the pursuing officers terminated their pursuits and lost track of defendant, after which there was a marked break in time and space before the next attempt to elude. From that evidence, the trial court could infer that after each of the first three attempts to elude, defendant would have believed that he had successfully eluded the officers and, therefore, stopped running and hiding. In addition, defendant's actions following some of the attempts to elude—such as his return to Medford, where he first fled from the police—provide additional support for an inference that defendant believed that those attempts to elude had been successful and, as a result, he had stopped running and hiding. The same evidence allowed the trial court to infer that each time defendant stopped running and hiding, time passed before the next officer located defendant and attempted to stop him.

We address the attempts to elude in turn. Rydell was the first officer to attempt to stop defendant. At 2:14 a.m., she signaled for him to stop. He drove away from her, slowly at first, but later with such speed that she lost sight of him. After that, Rydell and other officers continued to search for defendant. Rydell located him 20 minutes later, parked on the street. Defendant could have been hiding, as his car lights were off. However, given the evidence—that 20 minutes had passed and that defendant had parked the car and remained in it—the trial court could have found that defendant believed that he had successfully eluded the officers and, therefore, had stopped running and hiding.

From that evidence, the trial court could conclude that the first elude was complete and that there had been a sufficient pause in his criminal conduct to afford him an opportunity to renounce his criminal intent.

The second attempt to elude occurred when, upon being found by Rydell, defendant almost drove into her and, shortly thereafter, drove past Moffitt, who took up the pursuit.[3] Defendant attempted to elude Moffitt, going through a stop sign and several red lights and, eventually, driving toward Phoenix on S. Pacific Highway "extremely fast." After he lost sight of defendant, Moffitt drove to the center of Phoenix, where he spoke to bystanders who had seen defendant drive through and turn toward Interstate 5.

The next sighting of defendant was at 3:00 a.m., by Whiteman, who was in a parking lot in central Medford. It is true, as defendant points out, that the record does not reflect how much time elapsed between the time when Moffitt lost sight of defendant as he headed toward Phoenix and the time when Whiteman saw defendant back in central Medford. Despite that uncertainty, however, we conclude that the trial court could reasonably find that defendant had stopped running and hiding from the police between the end of Moffitt's pursuit and the beginning of Whiteman's pursuit. Moffitt lost sight of defendant before defendant arrived in Phoenix. In Phoenix, Moffitt consulted bystanders and learned that defendant had headed toward Interstate 5 and then returned to Medford. Thus, between Moffitt's pursuit and Whiteman's pursuit, defendant drove, at a minimum, from Phoenix to Medford. He was not running away from any officers during that time, and he does not appear to have been hiding, as demonstrated by the fact that he drove back to central Medford. Thus, the trial court could make the necessary findings to support its conclusion that defendant's attempt to elude Moffitt was complete and a sufficient pause had taken place before Whiteman began following him.

---

[3] As noted above, defendant was charged with one count of attempting to elude Rydell and one count of attempting to elude Moffitt. Thus, although there was no break between defendant's second elude of Rydell and his attempt to elude Moffitt, that does not prevent the entry of two convictions as to those two events: one for the first attempt to elude Rydell and one for the attempt to elude Moffitt.

While Whiteman followed him, defendant drove out of town, changed his speed erratically, and failed to maintain his lane. He sped up and Whiteman lost sight of him. Soon, Vollrath found defendant and followed him.[4] Eventually, defendant drove back to central Medford, where he ran a red light and sped away, losing Vollrath.

The next officer to pursue defendant was Hull. As noted, Vollrath lost sight of defendant in central Medford. Hull was watching for defendant at an intersection in Phoenix. Thus, defendant drove from central Medford to Phoenix without any officer pursuing him. Then, Hull testified, defendant stopped at the traffic light at the intersection where Hull was waiting. In contrast to his driving while attempting to elude his pursuers—specifically, failing to stop at numerous traffic lights and stop signs—defendant's stop indicates that, at that time, defendant was not attempting to elude Vollrath or any other officer. Again, given that defendant was not being pursued, had traveled from one city to another, and had changed his manner of driving, the trial court could infer that defendant had stopped running and hiding from the police. From that inference, the trial court could conclude that defendant's attempt to elude Whiteman had ended before his attempt to elude Hull began and that there was a sufficient pause between the two for defendant to renounce his criminal intent.

In sum, each of defendant's attempts to elude ended before the next began, and all of the violations were separated by pauses sufficient to afford defendant the opportunity to renounce his criminal intent. Thus, ORS 161.067(3) prevented merger of the guilty verdicts on defendant's four counts of attempting to elude a police officer, and the trial court properly entered four convictions.

Affirmed.

---

[4] Defendant was not charged with attempting to elude Vollrath.