No. 208 March 12, 2025 701

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUAN MARCOS BALLANGRUD,
*Defendant-Appellant.*

Lane County Circuit Court
19CR16880; A177942

Kamala H. Shugar, Judge.

Argued and submitted March 8, 2024.

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Lagesen, Chief Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

Lagesen, C. J. concurring.

**PAGÁN, J.**

Defendant appeals from his conviction, following a jury trial, for two counts of first-degree sexual abuse (ORS 163.427), resulting from his sexual touching of his step-daughter.[1] Defendant raises five assignments of error, arguing that the trial court erred by: (1 & 2) allowing witnesses and counsel to refer to the complaining witness as a "victim" and her allegations of abuse as "disclosures"; (3) failing to *sua sponte* correct the prosecutor's allegedly improper comments during closing argument; (4) improperly concluding that defendant's testimony "opened the door" to questions regarding the nature of his counseling; and (5) by erroneously determining that the two counts of sexual abuse were separated by a "sufficient pause" so as to prevent merger. We reject each of defendant's assignments and affirm.

## I.   FACTS AND PROCEDURAL HISTORY

In 2013, V was eight years old and lived with her mother, Bonilla, and Bonilla's husband, defendant. One day in May 2013, V reported to Bonilla that, the previous night, defendant had touched V's buttocks while they were in the living room on the couch, and that defendant had subsequently carried her to her bedroom and engaged in further sexual contact, including kissing her chest. Bonilla reported the abuse to the police, and V was interviewed by a forensic interviewer. Defendant was eventually charged with two counts of first-degree sexual abuse.[2]

At the trial, the state presented evidence from V, Bonilla, law enforcement, and Nichole Satterwhite, a forensic interviewer with Kids First Center, and it played recordings of two forensic interviews of V, conducted in 2013 and 2019. The defense argued that the abuse had not occurred and suggested that V had dreamt the event, pointing to her history of disturbing nightmares and occasional difficulty

---

[1] Defendant was also charged with a single count of first-degree sodomy. The jury acquitted him of that charge.

[2] Defendant was initially indicted in 2013. The charges were dismissed without prejudice when Bonilla and V moved out of the country and were unavailable. Defendant joined them abroad when the charges were dismissed. Charges were eventually brought again in 2019 when defendant returned to the country.

distinguishing between dreams and reality. The jury found defendant guilty on two counts of first-degree sexual abuse: one for touching V's buttocks and one for touching her breast.

At sentencing, the trial court concluded that there had been a sufficient pause between the two acts of abuse and that they did not merge. Defendant was sentenced to 75 months' incarceration and 45 months' post-prison supervision on each count, to be served concurrently.

## II.   USE OF THE WORDS "VICTIM" AND "DISCLOSURE"

In his first and second assignments of error, defendant asserts that various witnesses' use of the word "victim" in reference to V and that the word "disclosure" in reference to her reports of the abuse constituted improper vouching under *State v. Sperou*, 365 Or 121, 123, 442 P3d 581 (2019) (concluding that witnesses' use of the word "victim" in referring to the complainant constituted improper vouching when the only evidence of abuse was the testimony of the complainant and other alleged victims and where the defendant's theory of the case was that no abuse had occurred and the witnesses were either lying or mistaken).

Defendant filed a pretrial motion to prohibit witnesses from referring to V as the "victim" or her reports of abuse as "disclosures." The trial court granted the motion with respect to use of the word victim, but it denied the motion with respect to disclosures. Because of the differences in procedural posture, we address the arguments separately.

A.   *Use of the Word "Victim"*

Despite the court ruling that witnesses should not refer to V as a "victim," Officer Ryan Burks used the word twice when testifying about his initial contact with Bonilla following V's reports. In one exchange, he spoke generally about the procedure involved in taking initial reports of abuse:

"[Prosecutor]:   Okay. And could you tell the jury typically would you as a patrol officer then would the next step be to go talk to the daughter directly?

"A.    Given the daughter's age, no, we go through and we'll have a referral to the Kids First Center for the interview of the victim.

"Q.    All right. So you mean of the child who may—

"A.    Correct.

"Q.    —have experienced or witnessed something?

"A.    Correct.

"Q.    All right. So the—did you do that in this case, explain to the mom what the next procedure would be?

"A.    I did, I went through and provided her we call it a purple victim's card that has information, the phone number, the address for Kids First Center, and advised her that she needed to go through and take her daughter there and then to also call them to set up the appointment to go through and do that."

Later in the cross-examination, defense counsel asked about police procedures with respect to sexual assault cases, including that "victims" be advised not to change clothing, shower, or touch anything in the immediate area, and Burks confirmed that he did not give that advice, noting, "I had no contact with the victim, she was away at school."

Defense counsel did not object to Burks's use of the word "victim" in either of these exchanges. As a result, defendant requests plain error review. He asserts that the court erred in failing to strike those reference in accordance with the court's pretrial ruling.

However, at the conclusion of Burks's testimony, and out of the jury's presence, the court put on the record that a sidebar discussion had occurred about the use of the word "victim." The court stated:

"I wanted to put on the record that counsel and I discussed in the hall the fact that counsel was referring to a training manual that used the term victim and that I had not wanted to bring that up for or raise it in front of the jury, but that because counsel for Defendant was using that terminology, it was possible and it actually I think did happen at least one point where the officer used that same term because it was being used in questions of him, and I did

notice it throughout the testimony and *counsel agreed in our sidebar that I should not bring it up in front of the jury* or raise that and that that would just continue through this officer testimony, but I would ask counsel for both sides to make sure that their witnesses are advised not to use the term going forward."

(Emphasis added.) Because defendant agreed with the court that no corrective action should be taken, any error in not striking the statements was invited. The invited error doctrine provides that "if an appellant was actively instrumental in bringing about the error, then the appellant cannot be heard to complain, and the case ought not to be reversed because of it." *State v. Ferguson*, 201 Or App 261, 269, 119 P3d 794 (2005), *rev den*, 340 Or 34 (2006) (internal quotation marks omitted). "The point of the doctrine is to ensure that parties do not 'blame the court' for their intentional or strategic trial choices that later prove unwise and then, to the trial court's surprise, use the error that they invited to obtain a new trial." *Id.* at 270. Counsel agreed that no corrective action should be taken with respect to Burks's use of the word victim. We therefore reject defendant's first assignment of error.

B.   *Use of the Word "Disclosure"*

Defendant's second assignment of error challenges the trial court's pretrial ruling that witnesses would not be prohibited from using the word "disclosure," or variations thereof, to describe V's statements regarding abuse. Defendant maintains that the references to V's statements as "disclosures" throughout the trial implied that her statements were true and, therefore, constituted improper vouching.

We review whether a trial court admitted impermissible vouching evidence for legal error. *State v. Solano*, 332 Or App 646, 654, 551 P3d 938, *rev allowed*, 372 Or 763 (2024).

In *Solano*, decided after briefing was completed in this case, we declined to extend the holding from *Sperou* to the use of the term "disclosure." *Id.* at 655. We rejected the defendant's argument that the term disclosure necessarily "has the connotation of exposing previously hidden but truthful

information" and thus would be understood to be "a comment on the credibility of the accuser and of what was being revealed." *Id.* (internal quotation marks omitted). Instead, we concluded that "[t]he term itself does not express that the disclosed information is necessarily true or false. Rather, it suggests that the information was not previously shared." *Id.*

On the record before us in *Solano*, we concluded that the trial court did not err; however, we did not foreclose the possibility that "the term 'disclosure' may, in some instances, constitute improper vouching." *Id.* at 655 n 6. As the Supreme Court stated in *Sperou*, "[s]ome vouching is subtler, and certain statements might be vouching in some contexts but not others. Accordingly, it is important to consider each statement in the context in which it was made." *Sperou*, 365 Or at 128.

Having reviewed the record, we conclude that none of the uses of "disclosure" during the trial constituted vouching. While questioning Officer Burks, the prosecutor asked whether Bonilla appeared "to be reacting to the child's disclosure of this event appropriately," and Burks responded in the affirmative. In the context of that questioning, the prosecutor's use of the word disclosure did not convey any belief in the truth of the statements. The only other witness who used the word was the forensic interviewer, Satterwhite, who interviewed V in 2019. On direct examination, she discussed "the disclosure process" in general, using "disclosure" in terms of a child relaying their story and discussing some of the impediments to gleaning a complete and accurate story in a single forensic interview. When she later used the word specifically in reference to her interview of V, she used it interchangeably with the word "allegations." Based on this record, the use of the word "disclosure" did not imply any belief in the truth of the statements made and did not constitute improper vouching. We therefore reject defendant's second assignment of error.

III.  PROSECUTOR'S COMMENTS ON THE ABSENCE OF EVIDENCE OF A MENTAL HEALTH DIAGNOSIS

In his third assignment of error, defendant argues that the trial court plainly erred in failing to take corrective action or to declare a mistrial when the prosecutor

commented on the absence of evidence that V had been diag-
nosed with any mental health conditions and asserted that
her symptoms were not necessarily indicative of any men-
tal health concerns or diagnoses. We conclude that the trial
court did not plainly err.

We recount the procedural history regarding
this issue in some detail to give context to our discussion.
Defendant's theory of the case was that V's reports of abuse
were unreliable based on her history of nightmares and
disturbing hallucinations—effectively arguing that she
had dreamt or hallucinated the encounter and incorrectly
believed it had actually happened. During a pretrial hear-
ing, defendant offered the testimony of Dr. Wendy Bourg
regarding memory formation and loss, best practices for con-
ducting forensic interviews of children, features of psychotic
episodes, and hallucinations that can occur when transition-
ing between wakefulness and sleep. Bourg acknowledged
that she had not diagnosed V with any condition and had
not examined or assessed V in any way. The trial court ulti-
mately ruled that defendant could not offer testimony from
Bourg regarding any *potential* diagnosis without laying a
proper foundation and concluded that, without the founda-
tion, such testimony was not relevant, reliable, or probative
of any issue and called for speculation.

Bourg testified at trial to the same general infor-
mation that she discussed in the pretrial hearing, including
that psychotic episodes or sleep-state hallucinations can be
a cause of source confusion for memories. She acknowledged
that she had not reviewed any medical records and had not
performed any assessment of V.

In closing argument, defendant emphasized his the-
ory of the case: that V's reports could not be trusted given
her history of nightmares, hallucinations, and difficulty
with reality-testing, implying that she was unable to tell the
difference between something that was a dream and some-
thing that had actually happened. Defense counsel acknowl-
edged that Bourg had not diagnosed V with any mental
health condition. In rebuttal closing argument, the state
reminded the jury that there was no evidence in the record
that V had been diagnosed with any mental conditions and

argued that her history of bad dreams was "not necessarily indicative of a mental health concern or diagnosis or anything else[.]"

It is those final rebuttal arguments by the state that defendant argues were improper. Defendant did not object to the state's comments and, therefore, seeks plain error review, arguing that the error was so prejudicial as to have denied defendant a fair trial. *See State v. Chitwood*, 370 Or 305, 317, 518 P3d 903 (2022) (establishing that a "prosecutor's improper comments are reviewable as 'plain error' only if they constitute legal error, and they rise to that level only if they are so prejudicial that they deprived [the] defendant of a fair trial"). Defendant asserts that it was improper for the prosecutor to comment on the absence of evidence of a diagnosis when the court prohibited defendant from presenting that evidence.

We disagree with defendant's argument and characterization of the record. Defendant cites to *State v. Logston*, 270 Or App 296, 347 P3d 352 (2015), for the assertion that it is improper for a prosecutor to comment on a defendant's failure to present evidence that the defendant was prohibited from presenting as a matter of law. In that case, the defense presented a number of character witnesses who testified that the complainant in the sex abuse case had a reputation for dishonesty. *Id.* at 298-99. Under the rules of evidence, the defendant was prohibited from presenting testimony about specific instances of the complainant's untruthfulness. *Id.* at 305-06. Despite that evidentiary limitation, in closing argument, the prosecutor urged the jury to disbelieve the defense witnesses with respect to the complainant's credibility because the defendant had not given "'one single good example of what exactly' a reputation for being a liar meant." *Id.* at 298. We concluded that the prosecutor's comments were improper, holding that "when a defendant is prohibited from presenting an item of evidence as a matter of law, the prosecutor cannot comment on the defendant's failure to present that evidence to bolster the state's case." *Id.* at 306.

Defendant argues that the circumstances here are analogous to *Logston*. He asserts that the prosecutor's argument about the lack of a diagnosis could have induced the jury to reason that Bourg would have testified about V's

potential diagnoses had she believed V's symptoms to be severe enough to warrant it. We do not read the prosecutors statements as making any such suggestion. The prosecutor did not link the lack of diagnosis to Bourg's testimony or to any failure of defendant to offer particular evidence. The prosecutor merely commented, accurately, on the state of the record, which was that it contained no evidence that V had received any mental health diagnosis, and offered his argument, appealing to the juror's common sense, that bad dreams were not necessarily indicative of a mental health concern. The prosecutor's comments were not improper, and they certainly were not so improper as to deny defendant a fair trial and warrant plain error review. We therefore reject defendant's third assignment of error.

## IV.   THE NATURE OF DEFENDANT'S COUNSELING

In his fourth assignment of error, defendant assigns error to the court's ruling allowing the prosecutor to question defendant and Bonilla regarding the nature of counseling that defendant received, specifically that it had included treatment for addiction to pornography. We conclude that the court did not err.

Prior to the trial, defendant filed a motion *in limine* to limit testimony regarding the nature of the counseling he received in 2013, prior to the initial dismissal of the charges. Defendant argued that the nature of his treatment was not relevant, and even if it was, it should be excluded under OEC 403 as unduly prejudicial.[3] At the hearing, Bonilla testified that defendant had apologized for what had happened with V and told her that he was seeking counseling for pornography addiction. The court ruled that, at trial, the state would be permitted to question Bonilla about defendant's apology in the context of him seeking counseling in general but that the state would not be permitted to elicit testimony that the counseling was for purposes of addressing pornography addiction.

At the trial, Bonilla testified about a conversation she and defendant had, where Bonilla was upset with

---

[3] OEC 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

defendant for what he had done to V that caused the family to be separated. Bonilla testified that, in the context of that conversation, defendant apologized and represented that he was seeking counseling for what happened.

Defendant subsequently testified on his own behalf, denied having abused V, and denied having ever admitted to abusing her.[4] Following that testimony, the state asked the court to revisit its ruling regarding eliciting testimony about the nature of defendant's counseling. The state asserted that defendant's testimony that he never apologized for having done something to V made the nature of his counseling relevant to provide context to Bonilla's testimony regarding defendant's apology—specifically that he had made efforts to convince Bonilla that he was addressing the problems that had led to V's disclosure, including seeking treatment for a sexual problem. The state argued that defendant's testimony had opened the door to challenging him on the content of Bonilla's recollection related to defendant's efforts to seek counseling to address the problem, and that the context of him seeking counseling for issues of a sexual nature would challenge the testimony he gave denying that he had ever apologized. The court agreed that defendant's testimony had "opened the door" to the proposed line of questioning. The court later clarified its ruling, stating:

> "For the record, my earlier ruling regarding the door being opened to the evidence related to the pornography addiction and the purpose of the counseling and the general denials of apologies, I specifically if I—I'd like to clarify the record to say that I found that it was relevant because the defendant had made it relevant and called that into question based on his testimony and denials of ever having apologized and he was unequivocal about those denials and specifically I find that because of that it became more probative than prejudicial, I just wanted to make sure the record was clear."

The state cross-examined defendant about the nature of his counseling and later recalled Bonilla and elicited more details about the conversation the two of them had. Bonilla stated that he apologized and told her he was seeking help

---

[4] The parties agree that defendant's denial of having ever *admitted* to the abuse was also an implicit denial of having ever *apologized* for the abuse. We agree, and for ease of reading, we refer to defendant's testimony as a denial of the apology.

for "what he was being accused of and the pornography addiction he had."

On appeal, defendant asserts that the trial court erred in concluding that defendant's testimony (*i.e.*, that he had never apologized for abusing V) had "opened the door" to evidence about the nature of his counseling. He argues that "impeachment by contradiction requires a precise fact statement to which the rebuttal evidence is contradictory," citing *State v. Cuffy*, 322 Or App 642, 649, 521 P3d 516 (2022). Defendant maintains that the nature of his counseling does not contradict his testimony that he did not apologize for abusing V, because they address different facts. The state asserts that the trial court correctly allowed the testimony in to rebut defendant's contradictory statements, arguing that the details of his counseling were intimately intertwined with and provided context for Bonilla's testimony that defendant had apologized for what he did to V.

We review determinations of relevance for legal error. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) (noting that evidence "either is relevant or it is not").[5]

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. "OEC 401 establishes a very low threshold for the admission of evidence. Evidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Gibson*, 338 Or 560, 569, 113 P3d 423, *cert den*, 546 US 1044 (2005) (internal citation and quotation marks omitted). A party may offer contradictory testimony that relates to the circumstances of a crime or that rebuts testimony about a fact that is logically relevant to the historical, material facts in issue. *Id.* at 572-73.

---

[5] To the extent the trial court's decision to admit the evidence also encompassed a discretionary weighing of the probative value and prejudicial nature of the testimony under OEC 403, we would review that determination for an abuse of discretion. *State v. Boauod*, 302 Or App 67, 72-73, 459 P3d 903 (2020). Defendant has not assigned error to the discretionary component of the ruling; as a result, our review of the trial court's decision is for legal error only.

We conclude that the trial court did not err. Although we appreciate defendant's position that the nature of counseling is not itself a fact that is in direct contradiction with defendant's assertion that he never apologized for doing something to V, the broader context of the state's argument and the inferences drawn from defendant's and Bonilla's testimony demonstrate the connection and relevance. *See Lawrence v. Oregon State Fair Council*, 330 Or App 405, 412, 543 P3d 724 (2024) (examining the context of particular testimony and the purpose for which the evidence was offered to determine the relevance of contradictory evidence). The state framed Bonilla's testimony about defendant's apology and his assurances that he was addressing issues related to V's allegations in counseling as an admission of the events, and it characterized defendant's statements to Bonilla as an attempt to reconcile and assuage any concerns she may have had regarding reuniting the family. The breadth of defendant's denials regarding apologizing created a circumstance that evidence of the context of his apology necessarily impeached that testimony and demonstrated a consciousness of guilt. By denying that he had ever apologized, defendant also implicitly denied assuring Bonilla that he was seeking counseling to address what happened. The nature of defendant's counseling, and that he was seeking help for what had happened with V, was relevant to the jury's assessment of whether to believe Bonilla's testimony that defendant had apologized and made assurances to Bonilla that he was seeking help for a sexual problem (making it more likely that he had committed the charged acts), or to believe defendant's testimony that he never apologized for doing anything to V.

We conclude that the trial court did not err in admitting evidence regarding the nature of defendant's treatment because it was relevant context for Bonilla's testimony rebutting defendant's assertion that he never apologized for abusing V.

## V.  SUFFICIENT PAUSE

In his fifth assignment of error, defendant challenges his separate conviction and sentencing for both counts of first-degree sexual abuse. He first asserts that the record was insufficient to support a finding of a sufficient

pause between the two acts and, therefore, asserts that the counts should have merged into a single conviction, pursuant to ORS 161.067(3).[6] He additionally argues that he had a right to a jury determination on the question of whether the two acts were separated by a sufficient pause and that the court therefore erred by imposing separate convictions and sentences without the jury making that finding. We reject both arguments.

We begin with defendant's assertion that he was entitled to a jury finding on the presence of a sufficient pause, pursuant to *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000) (concluding that, other than the fact of a prior conviction, a jury must find beyond a reasonable doubt any fact that increases a crime's penalty beyond the prescribed statutory maximum). Defendant asserts that the question of whether the two acts that constituted sexual abuse were separated by a sufficient pause served to determine whether the acts could be punished separately, thereby determining whether he was subject to *any* punishment at all for the second act. Without a finding that the acts were separated by a sufficient pause, the maximum penalty defendant could have faced for the second act was no conviction or sentence at all; therefore, he asserts that the finding of a sufficient pause increased the penalty that he would otherwise have faced. The state maintains that *Apprendi* does not apply to the merger statute at issue.

Whether a factual issue requires a jury decision is a question of law that we review for legal error. *State v. Mallory*, 213 Or App 392, 398-405, 162 P3d 297 (2007), *rev den*, 344 Or 110 (2008).

We have previously rejected the application of *Apprendi* in the merger context. In *State v. Silas*, 288 Or

---

[6] ORS 161.067(3) states:

"When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

App 93, 403 P3d 807 (2017), the defendant argued that whether two violations were separated by a sufficient pause, and therefore did not merge, operated as an "enhancement fact" for sentencing that the state was required to plead and prove to the jury under *Apprendi*. *Silas*, 288 Or App at 94. We concluded that "a fact that the state must prove to preclude merger under ORS 161.067 is not an 'enhancement fact'" and "does not operate to increase the sentence that may be imposed upon conviction of a crime[.]" *Id.* at 94-95. Rather, we concluded, "it is a fact that, if proved, determines the number of convictions that may be entered for violations of the same statutory provision occurring during the same criminal episode." *Id.* at 95.

The jury-right rule set forth in *Apprendi* applies only to facts that increase a crime's penalty beyond the prescribed statutory maximum. Federal and Oregon courts have repeatedly emphasized that *Apprendi* does not extend beyond that narrow application. *See, e.g.*, *Oregon v. Ice*, 555 US 160, 168, 129 S Ct 711, 172 L Ed 2d 517 (2009) (declining to extend the *Apprendi* jury requirement rule beyond "the imposition of sentences for discrete crimes" and therefore not extending it to fact finding necessary to impose consecutive sentences); *State v. Cuevas*, 358 Or 147, 159, 168, 361 P3d 581 (2015) (explaining that *Apprendi* did "not apply to factual findings that reduce a defendant's sentence" or to "how a trial court should aggregate multiple sentences"). We have previously emphasized the difference between the merger analysis and the sentencing process, and we have urged trial courts not to conflate them:

> "[T]he phrase 'merged for sentencing purposes' is a misnomer and should never be used because it improperly conflates two distinct parts of the criminal process: the entry of convictions and the imposition of sentences. The concept of merger relates to the former and is controlled by ORS 161.067. The imposition of consecutive or concurrent sentences relates to the latter and is controlled by ORS 137.123. The two statutes operate independently."

*State v. Mason*, 241 Or App 714, 718 n 4, 250 P3d 976 (2011). Because the fact finding required under ORS 161.067 pertains only to the number of discrete convictions that may be entered, and not the enhancement of the sentence for any

one of those individual sentences, we conclude that *Apprendi* does not apply.[7]

We thus turn to defendant's argument that there was insufficient evidence to support the trial court's finding that there was a sufficient pause between the two acts of sexual abuse. The duration of a pause and what occurred during that pause are questions of fact, while the question of whether the pause is "sufficient" to allow for multiple convictions is one of law. *State v. Reed*, 256 Or App 61, 63, 299 P3d 574, *rev den*, 353 Or 868 (2013). We are bound by the findings of the trier of fact, provided that the findings are supported by constitutionally sufficient evidence. *Id.*

A sufficient pause is "a temporary or brief cessation of a defendant's criminal conduct that occurs between repeated violations and is so marked in scope or quality that it affords a defendant the opportunity to renounce his or her criminal intent." *State v. Huffman*, 234 Or App 177, 184, 227 P3d 1206 (2010). "For repeated violations to be separately punishable, one crime must end before another begins." *Id.* at 185 (internal quotation marks omitted). "In determining whether a 'sufficient pause' occurred, a court must consider the evidence regarding the duration of any pause, what happened during the pause, and whether the defendant's criminal conduct was 'qualitatively different' before and after the pause." *State v. Lasheski*, 309 Or App 140, 146, 481 P3d 966 (2021).

The two counts of sexual abuse that the jury found defendant guilty of involved defendant touching V's buttocks and defendant touching V's breast. The trial court found that the two acts of touching occurred in different locations, the first occurring in the living room on the couch, and the second in V's bedroom. The court further found that the two acts were separated by defendant picking V up in the living room and carrying her to the bedroom. The court's findings

---

[7] Defendant limits his argument to an extension of *Apprendi*, asserting that the finding of a sufficient pause operated as an enhancement factor. Defendant does not develop an argument that the Sixth Amendment otherwise requires the state to plead and prove to a jury the issue of a sufficient pause as a prerequisite to entry of more than one conviction, as discussed in the concurrence. We therefore offer no opinion on that issue in this opinion and limit our holding to defendant's *Apprendi* argument.

are supported by evidence in the record, including V's testimony at trial and her recorded statements made to the child abuse interviewers.

The findings made by the court establish a sufficient pause. There was a temporal break between the conduct on the couch and the conduct in the bedroom, including qualitatively different conduct occurring between the two acts (lifting V and carrying her to the other room). Despite the record not reflecting the amount of time between the two acts, the fact that defendant chose to cease his conduct on the couch and relocate to another room afforded defendant the opportunity to renounce his criminal intent. *See*, *e.g.*, *State v. Ortiz-Rico*, 303 Or App 78, 88-89, 462 P3d 741, *rev den*, 366 Or 827 (2020) (concluding that a temporal break between the two rapes at issue, long enough for the defendant to clear items from the back seat of a car and move the victim from the front seat to the back seat, and the qualitatively different conduct of moving items, constituted a sufficient pause to prevent merger). The court therefore did not err in determining that a sufficient pause separated the two acts of sexual abuse and in entering two separate convictions.

Affirmed.

**LAGESEN, C. J.,** concurring.

I concur in the majority opinion in all but one respect and concur fully in the disposition. On the fifth assignment of error, I would conclude that the Sixth Amendment, as incorporated against the states via the Fourteenth Amendment, required the state to plead and prove to a jury beyond a reasonable doubt that defendant's two violations of ORS 163.427 were separated by the "sufficient pause" described by ORS 161.067(3) as a prerequisite to punishing him twice for that course of conduct.[1] Nevertheless, because that constitutional error was harmless beyond a reasonable doubt, I would affirm the judgment in full.

---

[1] In the view of the majority opinion, "[d]efendant limits his argument to an extension of *Apprendi*, asserting that the finding of a sufficient pause operated as an enhancement factor." 338 Or App at 716 n 7. I read defendant's arguments more broadly to assert that the Sixth Amendment requires a jury finding of a sufficient pause under these circumstances. I understand defendant to rely on *Apprendi* as a supporting source for that argument.

As an initial matter, *State v. Silas*, 288 Or App 93, 403 P3d 807 (2017), does not resolve this case because it explicitly left open the Sixth Amendment question before us in rejecting an argument that rested solely on state statutes. *Id.* at 94. Beyond that, a brief exploration of the schematics of constitutional criminal procedure is in order to see why the Sixth Amendment, as construed by the Supreme Court in *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and similar cases, required the submission of the "sufficient pause" question to the jury. To understand an individual constitutional component's role within the Constitution's structural mechanics necessarily requires an understanding of how the individual component fits together with other components to make the Constitution work. In this particular instance, it is essential to understand the partnership between the Sixth Amendment jury trial right and the Fifth Amendment's prohibition on double jeopardy (also incorporated against the states via the Fourteenth Amendment) when it comes to safeguarding against multiple punishments for the same offense. *See, e.g.*, *Erlinger v. United States*, 602 US 821, 845, 144 S Ct 1840, 219 L Ed 2d 451 (2024) (discussing the "complementary protections" afforded to a criminal defendant by the Double Jeopardy Clause of the Fifth Amendment and the jury trial right contained in the Sixth Amendment). It also is essential to understand the practical role that ORS 161.067 plays in Oregon in implementing the Double Jeopardy Clause's prohibition on multiple punishments for the same offense.

I start with the schematics. "The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against multiple punishments for the same offense.*" *Brown v. Ohio*, 432 US 161, 165, 97 S Ct 2221, 53 L Ed 2d 187 (1977) (emphasis added; internal quotation marks omitted).

Where, as here, the state charges a criminal defendant with more than one violation of a single statutory provision arising out of the same course of conduct, and a jury finds that the defendant in fact committed those violations, a double jeopardy question arises at sentencing: How many

separately punishable offenses did the defendant commit through that course of conduct?

Courts generally refer to a case presenting this type of double-jeopardy sentencing issue as a "unit of prosecution" case. *See, e.g.*, *United States v. Rentz*, 777 F3d 1105, 1108 (10th Cir 2015) (en banc) (explaining that "unit of prosecution questions concern 'whether conduct constitutes one or several violations of a single statutory violation'" (quoting *Callanan v. United States*, 364 US 587, 597, 81 S Ct 321, 5 L Ed 2d 312 (1961))). To resolve the question whether multiple violations of a single statutory provision during the same course of conduct constitute more than one punishable offense, courts typically apply the same two-part test. The first part of the test entails a legal analysis, and the second part involves a factual analysis.

First, a court ascertains the "unit of prosecution," that is, "the minimum amount of activity a defendant must undertake, what he must do, to commit each new and separate independent violation of a criminal statute." *Rentz*, 777 F3d at 1109. That presents a question of statutory interpretation. *See id.*; *see also United States v. Woerner*, 709 F3d 527, 539-40 (5th Cir 2013) (explaining that the first step in a "unit of prosecution" case is to "look to the statute charged" to determine Congress's intent as to how to "castigate" the conduct at issue); *State v. Phillips*, 548 P3d 51, 57 (NM 2024) (explaining that the first step in a "unit of prosecution" case is to analyze the relevant statute to determine how many punishments the legislature intended to authorize under the facts and circumstances of the case); *State v. Barbee*, 386 P3d 729, 733 (Wash 2017) (question of unit of prosecution under a criminal statute is one of statutory interpretation and legislative intent). In conducting that analysis, courts apply the rule of lenity when, after thorough analysis, legislation remains ambiguous as to the unit of prosecution. *Rentz*, 777 F3d at 1113; *Phillips*, 548 P3d at 57; *Barbee*, 386 P3d at 382.

Second, having ascertained the unit of prosecution intended by the legislature, a court conducts a factual analysis to determine how many units of prosecution exist as a factual matter. *See Woerner*, 709 F3d at 540 ("Second,

we review the evidence to see how many distinct criminal acts the defendant committed."); *Phillips*, 548 P3d at 57; *Barbee*, 386 P3d at 733. The approach of the New Mexico Supreme Court is illustrative of the nature of that factual inquiry:

> "The second step requires us to determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute. To determine whether a defendant's acts are sufficiently distinct, we consider [the following] factors: (1) temporal proximity of the acts, (2) location of the victim during each act, (3) the existence of intervening events, (4) the sequencing of the acts, (5) the defendant's intent as indicated by his conduct and utterances, and (6) the number of victims."

*Phillips*, 548 P3d at 57 (internal quotation marks and citations omitted).

Upon determining that a case involving multiple violations of the same statute does not, as a factual matter, involve multiple units of prosecution, courts vary somewhat in how, procedurally, they effectuate the double-jeopardy protection against multiple punishments for the same offense. One common approach is to do what Oregon does under ORS 161.067: to "merge" the statutory violations found by the jury into a single count of conviction. *See, e.g.*, *Johnson v. State*, 868 SE 2d 226, 229 (Ga 2022) (explaining that process of "merger" implements the protections of "substantive double jeopardy law" against multiple punishments for the same offense); *State v. Armstrong*, 237 A3d 185, 189 (Me 2020) ("We take this opportunity to state a uniform rule of practice: when a trial results in multiple verdicts for the same offense, the appropriate procedure to prevent a double jeopardy violation is to merge, not dismiss, the duplicative counts."). Other courts take the approach of vacating multiplicitous convictions. *See, e.g.*, *People v. Wood*, 433 P3d 585, 593 (Co 2019) (discussing relationship between merging multiplicitous convictions and vacating them to effectuate double-jeopardy protections).[2]

---

[2] In the Oregon courts, we refer to the merger of "guilty verdicts" rather than merger of "convictions," for the reasons explained in *State v. White*, 346 Or 275, 279 n 4, 211 P3d 248 (2009). In the double jeopardy context, it does not appear to me to be uncommon for courts to refer to merger of convictions.

Although other state courts and the federal courts appear to address this type of "unit of prosecution" double jeopardy issue on a regular basis, Oregon appears to have avoided it. I suspect that is because ORS 161.067—a unique statute, as best I can tell—supplants the need for it. It does so by making crystalline the legislature's intention as to what constitutes an allowable unit of prosecution where the state has charged, and the jury has found, that the same conduct or "criminal episode" resulted in more than one violation of the same statute. Because of ORS 161.067(2), we know that when a defendant's "same conduct or criminal episode" violates the same statutory provision multiple times and there are multiple victims, each violation against a discrete victim represents a distinct unit of prosecution. Because of ORS 161.067(3), we know that when a defendant's "same conduct or criminal episode" violates the same statutory provision multiple times and there is only a single victim, then each violation is a discrete unit of prosecution if and only if, as a factual matter, it is separate from the other violations by the "sufficient pause" described in the statute:

> "When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

ORS 161.067(3).

That lay of the land in hand, I return to the question before us. Where the state seeks to punish a defendant for multiple violations of the same statute against the same victim arising out of the same criminal episode, does the Sixth Amendment require the state to plead and prove to the jury that each violation is separate from any other by the required "sufficient pause"? Or may that factual determination be made by the sentencing judge?[3]

---

[3] I note that in the circumstances covered by ORS 161.067(2), the finding of fact necessary to permit the imposition of multiple punishments—the existence

That question is a close one for me and, but for the United States Supreme Court's decision last year in *Erlinger*—that Court's most recent explication of the *Apprendi* rule—I would join the majority opinion in full. In *Erlinger*, the Court held that the Sixth Amendment requires a jury finding as to whether offenses occurred on separate occasions as a prerequisite to the imposition of enhanced sentences under the federal Armed Career Criminal Act. *Erlinger*, 602 US at 835. The Court emphasized—repeatedly—the principle that the Fifth and Sixth Amendments "provide a defendant with an entirely complementary set of protections at a different stage of the proceedings by ensuring that, once a jury *is* empaneled, the government must prove beyond a reasonable doubt to a unanimous jury the facts necessary to sustain the punishment it seeks." *Id*. at 845 (emphasis in original). Significantly, in so doing, the Court rejected an argument that the historical practice of allowing judges to make comparable factual determinations for purposes of resolving double-jeopardy questions meant that judicial factfinding was permissible. It reasoned that such judicial factfinding was permissible in those instances only because it occurred before a jury was empaneled: "The Double Jeopardy Clause protects a defendant by prohibiting a judge from even *empaneling a jury* when the defendant has already faced trial on the charged crime." *Id*. (emphasis in original).

The broad statement in *Erlinger*, that "once a jury *is* empaneled, the government must prove beyond a reasonable doubt to a unanimous jury the facts necessary to sustain the punishment it seeks," would appear to require the state to prove to that jury beyond a reasonable doubt the necessary "sufficient pause" required for the imposition of multiple punishments under ORS 161.067(3). That is because, in enacting ORS 161.067(3), the legislature made clear that the "sufficient pause" finding is *necessary* to sustain more than one punishment when the "same conduct or criminal episode" violates the same statutory provision multiple times against the same victim.

---

of separate victims—will inhere in the jury's verdicts of guilt, at least where a finding of guilt necessarily means that the jury found that the defendant's criminal conduct was committed against a particular victim.

On the other hand, taking that approach would be at odds with the longstanding practice of judicial factfinding in connection with sentencing in the context of "unit of prosecution" double-jeopardy cases, as I have described. In that context, judges routinely have made the factual determinations necessary to assess how many discrete units of prosecution result from a defendant's repeat violations of the same statutory provision during the same course of conduct. In *Erlinger*, though, the Court rejected the argument that the longstanding practice of judicial factfinding in the double-jeopardy context was grounds for relieving the government of its obligation to prove to a jury all facts necessary to sustain the punishment it sought. To be sure, the Court's analysis on the point focused only on the type of double-jeopardy questions that arise pretrial in a successive prosecution and did not, on its face, account for the role judicial factfinding has played in resolving the double-jeopardy issues that may arise at sentencing. Nevertheless, it suggests to me that the practice of judicial factfinding in resolving "unit of prosecution" questions for double-jeopardy purposes does not provide a basis for allowing judicial factfinding under the circumstances present here, where the legislature has explicitly stated what fact must be found to treat multiple violations of the same statutory provision against the same victim as more than one single punishable offense.

Stepping back a bit, there is another reason not to put much weight on the practice of judicial factfinding in "unit of prosecution" cases when evaluating what the Sixth Amendment requires. Where the legislature does not clearly delineate a unit of prosecution, it falls to the courts—judges—to implement the Double Jeopardy Clause's prohibition on multiple punishments. Ambiguity on the part of the legislature is what makes judicial factfinding necessary to ensure that a criminal defendant is not punished more than once for conduct that the legislature intended to constitute a single punishable offense. Judicial factfinding under those circumstances is a safety net, not a lodestar. By contrast, where, as here, the legislature has made it clear what facts necessarily must be found as a prerequisite to multiple punishments, I see no constitutional authority for depriving a

criminal defendant of the right to a jury trial on those necessary facts.

That leaves one question: whether the constitutional error in failing to submit the "sufficient pause" question to the jury is harmless beyond a reasonable doubt. *Neder v. United States*, 527 US 1, 18, 119 S Ct 1827, 144 L Ed 2d 35 (1999) (stating the harmless error standard applicable to violations of the Sixth Amendment jury-trial right). Having reviewed the record, I conclude that it is. The state's case rested on two distinct violations of ORS 163.427, one of which involved defendant touching the victim's buttocks, one of which involved defendant touching the victim's breasts. The evidence presented to the jury about those violations was that the incidents occurred in different locations (the living room and the victim's bedroom) and required defendant to displace different parts of the victim's clothing. No evidence was presented that would have suggested to the jury that the two incidents occurred at the same location. In finding defendant guilty of those two violations, the jury necessarily must have credited the victim's version of events: that defendant touched her buttocks in the living room, then carried her to her bedroom, where he touched her breasts, moving her clothing in each instance. Given the victim's description of (1) the temporal and physical space between the touchings and (2) the distinct character of each touching, I am confident, that if it had been presented with the question, the jury would have found that the incidents were separated by "a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce criminal intent." On these facts, defendant had an opportunity to change his mind and stop his abusive conduct before he abused the victim for a second time, and no reasonable factfinder, having found beyond a reasonable doubt that defendant committed the conduct in question, could find otherwise.

I respectfully concur.