48 April 29, 2026 No. 337

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SAMUEL WARREN RICH,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR58866; A181996

Adrian L. Brown, Judge.

Argued and submitted January 21, 2026.

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Deputy Attorney General.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

SHORR, P. J.

Convictions for Count 2 and Count 7 reversed and remanded for entry of a judgment of a single conviction for criminal mistreatment in the first degree; remanded for resentencing; otherwise affirmed.

**SHORR, P. J.**

Defendant appeals from a judgment convicting him of multiple crimes related to injuries he caused to his girl-friend's two-and-a-half-year-old son, W, and a supplemental judgment ordering restitution. Defendant raises nine assignments of error. In his first two assignments, defendant asserts that principles of issue preclusion and double jeopardy limited the state's ability to retry him or use certain evidence in a subsequent prosecution for counts on which the jury was unable to reach a verdict in his first trial. We conclude that the state was not barred from retrying defendant or using the evidence. In his third and fourth assignments of error, defendant argues that the trial court erred by imposing departure sentences on two counts when the state had not pleaded enhancement factors. The state concedes the error, and we accept the concession and remand for resentencing. In his fifth assignment of error, defendant argues that the court erred in failing to merge two counts of criminal mistreatment. We agree and remand for entry of a judgment merging the two counts. In his sixth and seventh assignments of error, defendant asserts that the trial court erred during sentencing with respect to his criminal history score on various counts. We conclude that the court did not err in the way urged by defendant, but we acknowledge that resentencing is necessary in light of other errors. In his eighth and ninth assignments of error, defendant raises multiple challenges to the court's order of restitution. We reject each of defendant's arguments regarding restitution. We therefore reverse and remand for merger of two of the counts of conviction and for resentencing, and we otherwise affirm.

## FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from injuries that he inflicted on his girlfriend's two-and-a-half-year-old son, W. On December 18, 2017, defendant was watching W while W's mother, Lawson, was working. Lawson received a phone call around 5:00 p.m. and swiftly left work, telling her supervisor that her child was injured and that she needed to leave. Half an hour later, defendant, Lawson, and W arrived at the emergency room. W had suffered a life-threatening injury

to his head and multiple other injuries to his body. Medical responders testified at trial that W did not have a pulse and was not breathing when he arrived at the hospital, and his body temperature was noticeably low. He underwent multiple surgeries and spent an extensive period of time in the hospital. Due to the brain injury, he is now paralyzed, blind, on a feeding tube, and needs 24-hour support.

Defendant was initially charged and tried by a jury on seven counts. Count 1, first-degree assault (ORS 163.185), and Count 2, first-degree criminal mistreatment (ORS 163.205), related to W's head injury; Count 3, first-degree criminal mistreatment, related to defendant's withholding of care and delaying seeking medical treatment following the head injury; Count 4, third-degree assault (ORS 163.165), and Count 5, first-degree criminal mistreatment, related to deep abrasions on W's shoulder; Count 6, third-degree assault, and Count 7, first-degree criminal mistreatment, related to other bruising and injuries across W's body (apart from the head and shoulder injuries). Defendant maintained that W had fallen down the stairs of the home and hit his head on a tile floor. The state presented numerous medical witnesses who opined that W's injuries were not consistent with a fall down the stairs but, instead, indicated abuse and were likely the result of assaultive conduct.

The jury returned a mixed verdict. The jury found defendant guilty on Count 3, for withholding care. It acquitted defendant of first-degree assault on Count 1 but found him guilty of the lesser-included charge of fourth-degree assault (ORS 163.160). It acquitted defendant on Counts 4 and 5, relating to the shoulder injury. The jury was unable to reach a verdict on the remaining counts (Counts 2, 6, and 7).

The state sought to retry defendant on the counts on which the jury did not reach a verdict. Defendant moved to dismiss the charge on Count 2, arguing that the jury's verdict on Count 1, acquitting him of first-degree assault with respect to W's head injury, precluded retrial on Count 2. For the same reasons, with respect to any retrial on Counts 6 and 7, defendant sought to exclude any evidence that suggested he had knowingly or intentionally caused W's head

injury. The court denied the motions, concluding that retrial was not prohibited. Defendant then entered a conditional no contest plea on Counts 2 and 7, reserving his right to appeal the court's ruling.[1]

At sentencing, the court merged the fourth-degree assault verdict on Count 1 into Count 2[2] and sentenced defendant to an upward dispositional departure sentence of 364 days in jail. The court found that enhancement factors included deliberate cruelty, the vulnerability of the victim, the violence inflicted, the permanent nature of the injury, and the degree of harm and loss caused. On Count 3, the court sentenced defendant to 20 months' incarceration, concurrent with the sentence on Count 2. On Count 7, the court again imposed a departure sentence, based on the same enhancement factors, and sentenced defendant to 60 months' incarceration, to run consecutive to the prison term on Count 3.

Following a multi-day hearing, the court issued a supplemental judgment ordering defendant to pay restitution in the amount of $7,495,343.93. Roughly one million was for past medical expenses and the remainder was for future medical expenses.

ISSUE PRECLUSION UNDER DOUBLE JEOPARDY

In his first assignment of error, defendant asserts that the trial court erred in denying his motion to dismiss Count 2 for purposes of retrial, arguing that the jury's "not guilty" verdict on first-degree assault on Count 1 precluded relitigating the issue of whether defendant intentionally and knowingly caused W's head injury, which was an element of Count 2. Relatedly, defendant asserts in his second assignment of error that, on any retrial on Counts 6 and 7 (relating to other bodily injuries W suffered), the state should have been precluded from presenting evidence suggesting

---

[1] As part of that plea negotiation, Count 6 was dismissed.

[2] The judgment states that defendant was convicted on Count 1 and that the "sentence merged with Count 2." We have noted previously that merger and sentencing are different phases and that the phrase "merged for sentencing" should not be used because it improperly conflates two distinct phases of the process: the entry of convictions and the imposition of sentences. *State v. Ballangrud*, 338 Or App 701, 715, 568 P3d 209 (2025).

that defendant violently attacked W and caused the brain injury, as the jury had already determined that defendant did not intentionally or knowingly cause the brain injury. We conclude that the jury's verdict on Count 1 does not preclude retrial for Count 2, and we therefore affirm the court's denial of defendant's motion to dismiss Count 2 and the denial of his motion to exclude evidence of a violent attack that caused W's brain injury.

Defendant's argument regarding issue preclusion as it relates to double jeopardy is rooted in federal case law interpreting the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.[3] The Oregon Supreme Court recently provided a detailed overview of double jeopardy jurisprudence, including noting that "the federal provision includes an issue preclusion component that precludes the state from relitigating an issue that was decided against it in an earlier trial, even if the earlier trial was not on an identical charge." *State v. Dodge*, 373 Or 156, 176, 563 P3d 339 (2025). The court summarized the concept as applying

> "when a defendant has been prosecuted for an offense and certain factual issues were resolved in the defendant's favor, as evidenced by the factfinder's verdict. When that occurs, the doctrine of 'collateral estoppel,' also called 'issue preclusion,' bars the state from relitigating the issues, even in connection with a different charge. [*Ashe v. Swenson*, 397 US 436, 446, 90 S Ct 1189, 25 L Ed 2d 469 (1970)] (holding that the federal double jeopardy provision includes a 'collateral estoppel' component); [*Yeager v. U.S.*, 557 US 110, 119 n 4, 129 S Ct 2360, 174 L Ed 2d 78 (2009)] (noting that 'the more descriptive term "issue preclusion" is often used in lieu of "collateral estoppel"'). In *Ashe*, the Court 'squarely held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial.' *Yeager*, 557 US at 119 (describing *Ashe*); [*Currier v. Virginia*, 585 US 493, 514, 138 S Ct 2144, 201 L Ed 2d 650 (2018)] ('Also shielded by the Double Jeopardy Clause is the issue-preclusive effect of an acquittal.')."

*Dodge*, 373 Or at 178.

---

[3] "No person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb[.]" US Const, Amend V. Defendant does not raise an argument under Article I, section 12, of the Oregon Constitution.

The United States Supreme Court has explained that

"the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."

*Ashe*, 397 US at 444 (internal quotation marks, citations, and footnotes omitted).

We begin with an examination of the elements of the crimes, as presented to the jury. On Count 1, the jury was first instructed to consider first-degree assault, as it related to W's head injury. The instructions read as follows:

"In this case, to establish the crime of assault in the first degree, the state must prove beyond a reasonable doubt the following elements:

"(1)   the act occurred on or about December 18, 2017;

"(2)   the defendant knowingly caused serious physical injury to [W], a child under six years of age;

"(3)   the defendant acted with an awareness that his conduct toward [W] was assaultive in nature; and

"(4)   the defendant negligently failed to be aware that his assaultive conduct would cause serious physical injury to [W]."

The jury was then instructed on the lesser included offense of fourth-degree assault:

"To establish the lesser included offense of assault in the fourth degree, the state must prove beyond a reasonable doubt each of the following two elements:

"(1)   the act occurred on or about December 18, 2017; and

"(2)   the defendant intentionally, knowingly or recklessly caused physical injury to [W]."

The jury was instructed to first consider first-degree assault, and only consider the lesser included offense if it found defendant not guilty of first-degree assault. The instructions also included definitions of physical injury, serious physical injury, and "assaultive in nature," and explanations of each of the mental states, including that proof of a higher mental state constituted proof of a lesser mental state.[4] As noted, the jury found defendant not guilty of first-degree assault and guilty of fourth-degree assault.

The question before us is what conclusions can be drawn from the jury's verdict. Defendant argues that the verdict could only be the product of the jury concluding that the state had failed to prove beyond a reasonable doubt that defendant *knowingly or intentionally* caused W's head injury, because the difference in mental state was the only difference between the two crimes that was reasonably in dispute in the trial. Defendant points out that there was no dispute that W was a child under the age of six or that he suffered serious physical injury, given the catastrophic result of his head injury and permanent impairment.

We disagree with defendant's position and conclude that other material differences between the elements of the crimes could rationally have been the basis for the jury's verdict. The primary difference is the requirement of a culpable mental state on the result element for first-degree assault, which is not a part of fourth-degree assault. Following the Supreme Court's decision in *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), decided mere weeks prior to defendant's trial, the trial court was required to instruct the jury regarding a culpable mental state as to defendant's awareness that his assaultive conduct would cause serious physical injury

_____

[4] In response to a question from the jury during deliberations regarding the elements of Count 1, the court acknowledged that a line had been omitted from the definition of "criminal negligence," which had been included on the rest of the mental states, acknowledging that it was established if a person acts with any of the more culpable mental states. The court noted the omission and provided the jury with that information.

to W.[5] The jury rationally could have concluded that defendant knowingly or intentionally caused physical injury to W—thus finding him guilty of fourth-degree assault—but found that the state had failed to meet its burden to prove beyond a reasonable doubt that defendant had the requisite mental state with respect to the extent of the serious physical injury his actions would cause, and therefore concluded that the elements of first-degree assault were not all met.

We acknowledge that in a number of cases we have held that there is little likelihood that a jury would find that a defendant had the requisite mental state with respect to knowingly engaging in assaultive conduct toward a child and not be at least criminally negligent with respect to the risk that a child could be injured as a result. *See, e.g.*, *State v. Tellez-Suarez*, 322 Or App 337, 338-39, 519 P3d 561 (2022), *rev den*, 370 Or 827 (2023); *State v. Chemxananou*, 319 Or App 636, 640, 510 P3d 954, *rev den*, 370 Or 303 (2022). However, in both of those cases, the result element of the charged crime was physical injury and not *serious* physical injury.[6] It is more readily inferable that an individual who engaged in assaultive conduct was at least criminally negligent as to the risk of causing physical injury than it is to infer that a person was criminally negligent as to the risk of causing serious physical injury with its attendant risk of death or serious and protracted impact. Furthermore, in each of those cases the state established the nature of the assaultive conduct: the defendant in *Tellez-Suarez* pushed a seven-year-old child into a wall and bookcase with sufficient force to cause lacerations to the child's head, 322 Or App at 339, and the defendant in *Chemxananou* strangled and kicked one child and hit another in the back of the head with a plate and punched them in the face, 319 Or App at 640. In contrast, here, the state did not set forth a theory as to what actions defendant actually engaged in that caused W's

---

[5] This was the first case that the trial judge and counsel had handled where *Owen* was an issue. There was significant discussion between the parties and counsel about how to address *Owen* in the jury instructions.

[6] Physical injury means "impairment of physical condition or substantial pain." Serious physical injury means "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." ORS 161.015 (7) - (8).

head injury. Unlike in other cases where the nature of the assaultive conduct was established, and therefore could be assessed in terms of the possibility that someone would not be at least negligent as to the possibility of causing physical injury, the jury here was not presented with any evidence as to the mechanism of the injury to W, other than the theory that it was assaultive and violent. It is thus possible under those circumstances that the jury could have found that defendant intentionally engaged in some form of assaultive conduct but the jury could have been unconvinced that the state had met its burden to prove beyond a reasonable doubt that defendant was at least negligent as to the extent of the *serious* physical injury that would result. *See State v. Nagy*, 346 Or App 149, 165, 585 P3d 5 (2025) (concluding that it was not harmless error to fail to give an *Owen* instruction on a first-degree assault charge because the jury's finding that the defendant "was aware of the assaultive nature of his conduct does not necessarily imply that he failed to be aware of a substantial risk that his assaultive conduct would cause [the victim] *serious* physical injury, because there was no direct evidence of precisely what conduct caused [the victim's injuries].").; *State v. Allen*, 321 Or App 678, 687-88, 517 P3d 1055 (2022) (concluding that the failure to given an *Owen* instruction on a first-degree assault charge was not harmless because it may have affected the outcome of the case as there was "nothing about the jury instruction in this case, or the alleged nature of [the] defendant's conduct, that necessarily would have required the jury to find that [the] defendant failed to be aware of a substantial risk that his conduct would cause [the victim] a serious physical injury, as that term was defined in the jury instructions, and that the risk was of such a nature and degree that [the] defendant's failure to be aware of that risk was a gross deviation from the standard of care").

The charge on Count 2, first-degree criminal mistreatment relating to the head injury, required proof that defendant "intentionally or knowingly caused physical injury" to W. The issue of whether defendant intentionally or knowingly caused W's head injury was not necessarily decided by the jury acquitting defendant of first-degree assault on Count 1. The trial court therefore did not err in

denying defendant's motion to dismiss Count 2 on the basis of issue preclusion. For the same reasons, the court also did not err in denying defendant's motion to exclude evidence relating to abusive head trauma or of defendant intentionally or knowingly causing W's head injury for purposes of re-trying Counts 6 and 7. We therefore affirm the convictions on Counts 2 and 7 based on defendant's conditional no contest plea.

MERGER

In his fifth assignment of error, defendant challenges his separate convictions for Counts 2 and 7, asserting that the record was insufficient to support a finding of a sufficient pause between the two acts and, therefore, that the court should have merged the counts into a single conviction, pursuant to ORS 161.067(3). We agree that the trial court erred in failing to merge the two counts.

We begin by noting that we reject the state's argument that defendant's unqualified no contest plea on Counts 2 and 7 means he assented to the broadest construction of the plea, and that his plea has the effect of acknowledging that the offenses were separate offenses based on different acts. The cases cited by the state all involved situations where pleas were entered prior to trial, without the benefit of the development of a factual record, and thus resolved issues of merger based exclusively on a textual interpretation of the indictments at issue. *State v. Cid*, 331 Or App 231, 240-41, 545 P3d 1278, *rev den*, 372 Or 787 (2024) (concluding that the broadest reading of the indictment's "separate act and transaction" language was dispositive in supporting a conclusion that the defendant had pleaded guilty or no contest to separate counts that did not merge); *State v. Slagle*, 297 Or App 392, 395-97, 441 P3d 644, *rev den*, 365 Or 557 (2019) (concluding that the wording of the indictment itself allowed for a broad construction of the ten counts of first-degree encouraging child sexual abuse as each pertaining to a different child victim, and not relying on the state's sentencing memorandum identifying the specific individual victims, which the defendant argued had amended the charge to refer to separate victims); *State v. White*, 280 Or App 170, 380 P3d 1205 (2016), *rev den*, 360 Or 752 (2017) (indictment

charged multiple counts of identity theft as to the same victim over a range of dates; state did not present any evidence about the individual counts; broadly construing the plea, trial court could find for purposes of merger that the incidents occurred on separate dates within the alleged range and therefore were separated by a sufficient pause); *State v. Ostrom*, 257 Or App 520, 306 P3d 788 (2013) (indictment charged each count of theft as occurring within a date range; trial court accepted state's representation that one theft was caught on videotape and that "there were admissions to four other discrete incidents of theft"; trial court could conclude that each theft occurred on a different date, and thus could conclude that the thefts were separated by sufficient pauses and were separately punishable offenses).

The circumstances in this case are quite different. The factual record surrounding Counts 2 and 7 had already been developed at trial. During the plea hearing, the state and defendant agreed that the record developed at trial constituted the factual basis to support the plea, and it was that record that informed the court's findings discussed below. Unlike the cases noted by the state, where we were left to evaluate merger solely on the wording of the indictment and minimal facts placed on the record in conjunction with the plea, here the parties agreed that the entire trial record constituted the factual basis for the plea. We therefore conclude that we are not limited to the bare text of the indictment, and its broadest possible reading, and can consider the same record that was considered by the trial court to resolve the merger issue. We therefore turn to the merits of defendant's argument that Counts 2 and 7 should have merged.

ORS 161.067(3) states, in relevant part:

"When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

We review the trial court's merger rulings for legal error. *State v. Ortiz-Rico*, 303 Or App 78, 84, 462 P3d 741, *rev den*, 366 Or 827 (2020). In so reviewing, we are bound by the trial court's factual findings, so long as there is constitutionally sufficient evidence in the record to support them. *Id*. The duration of a pause and what occurred during that pause are questions of fact, while the question of whether the pause is "sufficient" to allow for multiple convictions is one of law. *State v. Reed*, 256 Or App 61, 63, 299 P3d 574, *rev den*, 353 Or 868 (2013).

A sufficient pause is "a temporary or brief cessation of a defendant's criminal conduct that occurs between repeated violations and is so marked in scope or quality that it affords a defendant the opportunity to renounce his or her criminal intent." *State v. Huffman*, 234 Or App 177, 184, 227 P3d 1206 (2010). "For repeated violations to be separately punishable, one crime must end before another begins." *Id*. at 185 (internal quotation marks omitted). "In determining whether a 'sufficient pause' occurred, a court must consider the evidence regarding the duration of any pause, what happened during the pause, and whether the defendant's criminal conduct was 'qualitatively different' before and after the pause." *State v. Lasheski*, 309 Or App 140, 146, 481 P3d 966 (2021). It is the state's burden to prove facts that establish a sufficient pause. *State v. Moscote-Saavedra*, 320 Or App 682, 691, 514 P3d 1169 (2022).

Both Count 2 and Count 7 were for criminal mistreatment in the first degree, ORS 163.205, toward W. Count 2 was based on defendant causing W's head injury and Count 7 was related to other bodily injuries.[7] During sentencing, the trial court made some findings regarding its view of the evidence when discussing the issue of merger of the two counts and with respect to the imposition of consecutive sentences. It stated:

> "So I am first going to address the merger issue. So there was agreement amongst counsel, as we know, that Count 1, the lesser included offense of Assault 4 involving the serious head injury moves or merged—is merged into Count 2,

---

[7] Those other bodily injuries included bruising and abrasions apart from the specific shoulder abrasion that was addressed in Counts 4 and 5, for which the jury acquitted defendant.

mistreatment in the first degree, which was also the head injury. And for the same reasons, the Count 1 merges with Count 2. The Court finds that Count 7 does not merge with Count 2.

"Indeed, one of the arguments put forth by the Defense was that—and agreed upon by the State, that Count 1 merges with Count 2 because there is no additional evidence provided. However, in Count 7 the Court does not— finds that that does not merge with Count 2 because at trial the evidence relied upon by the jury in convicting on Count 2, the head injury, is simply not the same evidence relied upon in the jury coming back hung on Count 7, which then the Defendant later pled no contest to and the Court found him guilty of.

"And indeed, I went back and listened to the colloquy with [defendant] on the no contest plea and both parties agreed that the Court could consider the entirety of the trial in determining the issues in this case including merger. And the Court finds that there is a significant distinguishing issue between [a] pediatric forensic trauma doctor looking at something and assessing whether or not the child has been abused versus an accident, and whether or not bruises occurred over multiple days or times, or whether or not it's all one incident.

"Here, the Court took Dr. McKeag Swan's testimony in regards to the issue of the bruising and the head trauma as showing that there was a complete picture that she must assess for abuse. And in that way, she was distinguishing between abuse and accident. And indeed, the jury, while, as I noted earlier in the day, did not find the Defendant guilty of the mental state. Therefore, the Assault 1 charge—because they did find him guilty of the lesser included offense of Assault 4 during the head injury, it's clear the jury did not see that as a mistake. Even though it's negligence, it still wasn't an accident. It wasn't a mistake. It was—it was an assaultive head injury.

"And that is very different, a very different action than mistreatment and bruising whereas in Count 2, the mistreatment relate[s] to the head injury. So I believe I put enough on the record there to show the Court's findings on that regarding why Count 7 does not merge with Count 2.

"And as to the nature of the sentences the Court will hand down between concurrent and consecutive, I will say

that the Court has the puzzle pieces providing an extensive amount of violence and mistreatment that [defendant] executed against [W] who was a healthy, thriving two and a half year old, but the puzzle was, in essence, bewitched. The pieces could fit together in many ways.

"And while I'm not here to guess, and certainly, Dr. McKeag Swan couldn't provide the jury with the actual physical act or acts that took place, each piece taken separately does indeed show a distinct criminal act on the part of the Defendant. Which at each turn, at each piece, the Defendant had a substantial pause to make a separate and distinct choice to either inflict additional harm upon [W] or to renounce his intention, to call 911 or to not, to go get alcohol or to stay home. He had, and did make choices.

"He had hours, and one does not need to go much more in the knowledge of the ways of the world to say one hour with a two and a half year old can feel like a year sometimes. And indeed, when he was home alone with [W], he had a substantial time, and did make choices in that time. And in that way, the Court believes that there are sentences that because of these distinct acts and the pause that he had the choices, time to make those choices and decide to inflict additional harm. And no matter the order of the pieces, the harm certainly was cumulative, and that delay at the very end, as we all agree, was the only thing we can say was what happened before he—eventually, [W] was received in the emergency room, and as Dr. Swan testified, was in the process of dying."

While the trial court's findings are somewhat unclear as specifically relating to its merger analysis, we understand the court to have primarily based the decision on the finding that there were different actions committed that caused the head injury versus the body injuries. That a series of actions can be charged as multiple counts, based on individual blows or touches, is not sufficient to establish that counts do not merge. *See Lasheski*, 309 Or App at 147-50 (the fact that the defendant engaged in three separate acts of touching three different intimate body parts of the victim was insufficient on its own to establish a sufficient pause for purposes of the merger analysis); *State v. Glazier*, 253 Or App 109, 117-18, 288 P3d 1007 (2012), *rev den*, 353 Or 280 (2013) (merger was required in light of evidence of one

continuous and uninterrupted attack, consisting of three different assaultive acts of pulling the victim off a bed, hitting her head into the floor, and kicking her in the torso). Therefore, the fact that the court concluded that separate acts caused the head injury and the body injuries was not enough to complete the merger analysis.

To the extent that the trial court's explanation can be considered to be fact finding regarding a pause between acts, or findings as to what happened before, during, and after the pause, we conclude that there is not sufficient evidence to support a finding of a sufficient pause. There was no evidence presented as to how much time—if any—passed between the acts that resulted in the various injuries, despite the court's conclusion that different acts resulted in the head wound and the other body injuries. The state acknowledged in closing arguments that it was unknown what precisely had happened to W during the hours he was in defendant's care, but it argued that defendant was responsible because he was the only one who was alone with W. That lack of information is dispositive. Without any evidence of the timing of the various injuries, there is no evidence of a pause, sufficient or otherwise.

The state asserts on appeal that a finding of a sufficient pause is supported by evidence of various bruises appearing older than others, meaning they did not all occur during the same incident. We first note that the trial court did not appear to make such fact finding. Regardless, although there was some evidence that some of W's bruises appeared to be at different stages of healing, multiple experts testified that it was impossible to assign a precise date or time frame to the individual bruises. The state's theory of the case, including the injuries encompassed in Count 7, was that W was in perfectly good health before spending the day in defendant's care and that something had gone terribly wrong during the day. But the state failed to elicit any evidence of the mechanisms of injury or the nature of defendant's assaultive acts constituting Counts 2 and 7, and thus there was no evidence of whether there was any pause between acts that afforded defendant the opportunity to renounce his criminal intent. *See, e.g.*, *State v. Mankiller*,

344 Or App 327, 342, 580 P3d 313 (2025), *rev den*, ___ Or ___ (Apr 9, 2026) (concluding that "there was no evidence whatsoever as to how much time passed" between the two acts, such that the two counts must merge); *State v. Zachery*, 304 Or App 476, 479, 467 P3d 827 (2020) (holding that counts should have merged where the state failed to adduce any evidence of the timing of the acts and therefore had failed to prove a sufficient pause between individual acts). The trial court therefore erred in failing to merge the guilty verdicts on Counts 2 and 7.

## SENTENCING

Defendant raises four assignments of error related to sentencing.[8] We reverse and remand for resentencing, both due to our conclusion above that Counts 2 and 7 must merge and based on the trial court's error relating to departure sentences. We further conclude that the court did not err in reconstituting defendant's criminal history score for purposes of Count 3 and did not plainly err when it imposed consecutive sentences.

A.  *Departure Sentences*

In his third and fourth assignments of error, defendant asserts that the trial court erred in imposing departure sentences on Counts 2 and 7 because the state did not provide notice of the intent to rely on any enhancement factors to justify the departure sentences. The state concedes the error and we accept the concession.

ORS 136.765 states:

"In order to rely on an enhancement fact to increase the sentence that may be imposed in a criminal proceeding, the state shall notify the defendant of its intention to rely on the enhancement fact by:

"(1)  Pleading the enhancement fact in the accusatory instrument; or

"(2)  Providing written notice to the defendant of the enhancement fact, and the state's intention to rely on it, no later than 60 days after the defendant is arraigned on an indictment, waives indictment or is held to answer

---

[8]  Assignments of error relating to restitution are discussed separately below.

following a preliminary hearing, or 14 days before trial, whichever occurs earlier, unless the parties agree otherwise or the court authorizes a later date for good cause shown."

The state acknowledges that it did not plead any enhancement facts and did not seek departure sentences. The trial court, however, found that the circumstances warranted an upward departure sentence on Counts 2 and 7, and it found that the enhancement factors included deliberate cruelty, the vulnerability of the victim, actual violence toward the victim, the permanent nature of the injury, and the degree of harm and loss inflicted. That was error based on the lack of notice to defendant of intent to rely on enhancement factors.

On remand, following the merger of Counts 2 and 7, the court may not rely on enhancement factors during resentencing. *State v. Dearmitt*, 321 Or App 628, 630, 517 P3d 368 (2022) ("A sentencing court may not rely on aggravating facts that were not included either in the indictment or in written notice to the defendant to support an upward departure.").

B.  *Separate Criminal Episodes*

In his sixth assignment of error, defendant argues that the trial court erred in reconstituting his criminal history score for purposes of sentencing on Counts 3 and 7, asserting that all of the counts arise from the same criminal episode and therefore his criminal history score should have remained the same for sentencing on all counts.[9] In his seventh assignment of error, defendant makes a similar argument regarding the counts arising from the same criminal episode, in arguing that the court erred in imposing consecutive sentences on Counts 3 and 7. We conclude that the trial court did not err in reconstituting defendant's criminal history score on Count 3 because the evidence supports a finding that it was a separate criminal episode.

---

[9] In imposing the prison sentences, the court found defendant's criminal history score was H for purposes of Count 2. Factoring in the conviction on Count 2, the court then found defendant's criminal history score was D for purposes of Count 3. Factoring in the conviction on Count 3, the court found his score to be B for purposes of Count 7. *See* OAR 213-004-0007 (defining criminal history categories).

We review defendant's sentence for legal error. ORS 138.105(7), (8)(c)(A). "Whether conduct giving rise to convictions constitutes a single criminal episode is a question of law, although the answer to that question may depend on predicate findings of historical fact." *State v. Dent*, 324 Or App 167, 172, 525 P3d 487 (2023) (internal quotation marks omitted).

A trial court may reconstitute a defendant's criminal history score for multiple convictions in the same proceeding only if the convictions constitute separate criminal episodes under statutory and constitutional former jeopardy provisions. *State v. Crook*, 331 Or App 524, 533, 547 P3d 158, *rev den*, 372 Or 718 (2024). We have noted multiple tests for resolving that issue, including examining "whether the charges are so closely linked in time, place and circumstances that a complete account of one charge cannot be related without relating details of the other charge," or looking to "whether the charges arose out of a single criminal episode, defined as continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective." *Id.* (internal quotation marks omitted). We conclude that the trial court did not err under either test.

As noted above, Counts 2 and 7 must merge as there was no evidence of a sufficient pause between acts, and resentencing is warranted based on that merger. Therefore, we limit our discussion to the distinction between those two counts considered together (the injury acts) and the acts that constituted Count 3, first-degree criminal mistreatment based on withholding of care. We readily conclude that causing injuries and withholding care for those injuries are separate criminal episodes. The details of the charges arising from the injuries could be related without relating the details of the withholding of care, and vice versa. Indeed, defendant could have been convicted on Count 3 for withholding care even if the jury had believed that W's injuries were accidental.[10] Those differences also dictate the result under the second test: the decision to withhold care, potentially

---

[10] A person commits first-degree criminal mistreatment for withholding care when the person, having assumed the permanent or temporary care, custody, or responsibility for the supervision of another person, intentionally or knowingly withholds necessary and adequate physical care or medical attention from that

for an extended period of time based on the evidence elicited at trial, demonstrates a different criminal objective between the counts. The circumstances surrounding a decision to harm a child are different from the ongoing choice to not seek immediate care for life-threatening injuries. The crimes are directed to the accomplishment of different criminal objectives—causing injury versus concealing or avoiding responsibility for the injury. *See, e.g., Orchard v. Mills*, 247 Or App 355, 359, 270 P3d 309 (2011), *rev den*, 352 Or 33 (2012) (concluding that the defendant's acts of striking the victim with his car and subsequently fleeing the scene—resulting in convictions for second-degree assault and failure to perform duties of a driver—were not directed to the accomplishment of a single criminal objective). The court therefore did not err in reconstituting defendant's criminal history score for purposes of Count 3.

For similar reasons, we reject as not plain error defendant's seventh assignment of error regarding application of the "shift-to-I" rule for consecutive sentences.[11] *See State v. Taylor*, 293 Or App 460, 465, 428 P3d 939 (2018) (noting that the "shift-to-I" rule applies only when consecutive sentences are imposed for crimes that arise from a single criminal episode). However, for the other reasons discussed in this section, resentencing on all counts is required.

## RESTITUTION

Following a hearing, the court issued a supplemental judgment imposing nearly $7.5 million in restitution on Count 3 for W's past and future medical expenses related to his brain injury. In his eighth assignment of error, defendant asserts that he was entitled to a jury determination of restitution, under both the state and federal constitutions. In his ninth assignment of error, defendant challenges the portion of restitution that was awarded for W's future medical expenses, asserting that future medical expenses do not qualify as economic damages for purposes of restitution and that the amount of damages awarded was not supported by

---

other person. ORS 163.205(1)(a). There is no requirement that the defendant have caused the situation necessitating medical attention.

[11] Defendant concedes that he did not preserve the argument and requests plain error review.

the record. We reject defendant's arguments and affirm the restitution award.

A.   *Right to Jury*

Defendant argues that he was entitled to a jury determination of restitution pursuant to the Oregon Constitution. Article I, section 17, provides: "In all civil cases the right of Trial by Jury shall remain inviolate." Defendant argues that restitution proceedings qualify as civil cases for purposes of Article I, section 17, based on history and the interconnectedness of the criminal restitution and civil damages frameworks. Defendant acknowledges that his position has been historically rejected by the Oregon appellate courts, but he asserts that those cases were rooted in rationale that only applied to former versions of the restitution statutes, which have since been amended. *See State v. Dillon*, 292 Or 172, 179-80, 637 P2d 602 (1981) (concluding that, in spite of resemblance to civil proceedings, the purposes of restitution are penal, not compensatory, and therefore "restitution must be understood as an aspect of criminal law, not as a quasi-civil recovery device"); *State v. Hart*, 299 Or 128, 137-39, 699 P2d 1113 (1985) (adhering to *Dillon*); *State v. Hval*, 174 Or App 164, 180-81, 25 P3d 958, *rev den*, 332 Or 559 (2001) (citing *Dillon* and *Hart* for the proposition that an award of damages to the victim of a hit and run had "all the earmarks of a penal sanction" consistent with criminal restitution, and given the penal function of the award, the defendant "was not entitled to a civil jury trial on the issue of the imposition and amount of the award"). Defendant additionally attempts to distinguish the restitution scheme in adult criminal cases from the restitution statutes for juvenile delinquency cases and urges us not to follow the Supreme Court's reasoning in *State v. N. R. L.*, 354 Or 222, 311 P3d 510 (2013), in which it concluded that the obligation to pay restitution in a juvenile delinquency case is penal in nature and is not a civil proceeding that entitles a youth to a jury under Article I, section 17.

Defendant's arguments are not well taken. Even following the revision to the restitution statutes, the Supreme Court has continued to refer to criminal restitution as "a penalty in the criminal case," *State v. Fox*, 370 Or 456, 468,

521 P3d 151 (2022), and has cited to both *N. R. L.* and *Hart* with approval in reaffirming that restitution is not a civil proceeding:

> "We also do not mean to imply that the recovery of 'economic damages' makes a restitution proceeding into a civil proceeding. Restitution is a penalty that serves a penal purpose. As the court stated in *State v. N. R. L.*, 354 Or 222, 226, 311 P3d 510 (2013), 'the theory behind restitution is ultimately penalogical: It is intended to serve a rehabilitative and deterrent purpose by causing a defendant to appreciate the relationship between his criminal activity and the damage suffered by the victim.' (Quoting *State v. Hart*, 299 Or 128, 138, 699 P2d 1113 (1985))."

*State v. Ramos*, 358 Or 581, 599 n 11, 368 P3d 446 (2016). *See also State v. Campbell,* 296 Or App 22, 27 n 5, 438 P3d 448 (2019), *rev'd on other grounds*, 366 Or 825, 470 P3d 369 (2020) (citing *Ramos*, 358 Or at 599 n 11, for the proposition that the importance of civil law concepts in the restitution analysis does not convert a restitution proceeding into a civil proceeding). We therefore reject defendant's assertion that the Article I, section 17, right to a jury in a civil proceeding attached to the restitution proceeding.

Defendant also briefly asserts that he was entitled to a jury for restitution purposes pursuant to the Sixth Amendment to the United States Constitution or, if not, then the Seventh Amendment.[12] We have previously held that the Sixth Amendment right to a jury does not apply to Oregon's restitution proceedings. *State v. Deslaurier*, 277 Or App 288, 289, 371 P3d 505 (2016). The Supreme Court has acknowledged that the Seventh Amendment has not been

---

[12] The Sixth Amendment states:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."

The Seventh Amendment states:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

extended to the states via the Fourteenth Amendment, with the exception of the final phrase. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 558 n 15, 17 P3d 473 (2001) (citing *Minn. & St. Louis R.R. v. Bombolis*, 241 US 211, 36 S Ct 595, 60 L Ed 961 (1916)). Defendant has not developed an argument for why we should disregard that precedent. We therefore reject his arguments under the federal constitution.[13]

B.   *Restitution for Future Medical Expenses*

Defendant raises two arguments with respect to the portion of the judgment awarding $6,324,387.14 in future medical expenses. Defendant first asserts that anticipated future medical expenses are not encompassed in the statutory definition of economic damages, and therefore, the court could not award them as part of the restitution. Defendant did not preserve that argument below. In anticipation of sentencing, defendant raised two primary arguments related to restitution: that W's father was not an appropriate "victim" for purposes of restitution and that the claimed future damages were speculative and the calculations were so complex that the issue should be resolved as part of the civil lawsuit that had been initiated against defendant. Those same issues, along with how the court was supposed to assess information about the valuation of future damages, were discussed at the multi-day sentencing hearing. Defendant has not identified any other point in the record where he asserted that future medical expenses were an inappropriate category for restitution based on the statutory definitions. We therefore conclude that it is not preserved. Defendant has not requested plain error review and we therefore do not consider the argument. ORAP 5.45(7); *State v. Ardizzone*, 270 Or App 666, 673, 349 P3d 597, *rev den*, 358 Or 145 (2015) ("[W]e ordinarily will not proceed to the question of plain error unless an appellant has explicitly asked us to do so because it is incumbent upon the appellant to explain to us why an error satisfies the requisites of plain error and, further, why we should exercise our discretion to correct that error." (Internal quotation marks omitted.)).

---

[13] Our rejection of defendant's challenges to the imposition of restitution on this basis is consistent with *State v. Myers*, ___ Or App ___, ___, ___ P3d ___ (Apr 29, 2026) (slip op at 8-14), which was issued today.

Defendant additionally argues that, even if future medical expenses were an appropriate category for restitution in general, the calculation of future medical expenses for W was not objectively verifiable, due to the uncertainty surrounding W's life expectancy, what conditions he may or may not develop in the future, and the overall cost of medical care.[14] We reject defendant's argument. The record supports the finding that future medical costs will be incurred, and such costs are capable of verification through objective facts. *State v. Yocum*, 247 Or App 507, 512, 269 P3d 113 (2011), *rev den*, 352 Or 25 (2012) ("[T]he term 'objectively verifiable monetary losses' means losses that are 'capable of verification through objective facts.'" (Quoting *DeVaux v. Presby*, 136 Or App 456, 463, 902 P2d 593 (1995).)). We review the evidence supporting the trial court's restitution order in the light most favorable to the state. *State v. Kirkland*, 268 Or App 420, 421, 342 P3d 163 (2015). The state presented evidence in the form of a Life Care Plan that estimated W's life expectancy and future medical needs in great detail. That report supported the court's award of restitution. We therefore affirm the judgment with respect to restitution.

## CONCLUSION

In summary, we reject defendant's argument that principles of issue preclusion and double jeopardy barred the state from retrying him on Count 2 or prevented the state from using evidence of defendant intentionally or knowingly causing W's head trauma against him in a subsequent prosecution. The trial court did not err in denying defendant's motion to dismiss Count 2 or in denying his motion to exclude evidence. However, we conclude that the trial court erred in failing to merge Count 2 and Count 7, as the record contains no evidence to support a finding of a sufficient pause. In light of that determination, and due to the state's concession that the trial court erred in imposing departure sentences on Counts 2 and 7 without the state having pleaded enhancement factors, remand for resentencing is

---

[14] Defendant generally raised these issues during sentencing in his argument regarding the speculative nature of the damages and the complexity of the calculations, specifically emphasizing the lack of certainty regarding W's life expectancy and future needs. Due to our disposition on the merits, we assume without deciding that the issues are all adequately preserved.

necessary. We further conclude that the trial court did not err with respect to ordering restitution for W's future medical expenses.

Convictions for Count 2 and Count 7 reversed and remanded for entry of a judgment of a single conviction for criminal mistreatment in the first degree; remanded for resentencing; otherwise affirmed.